Filed 5/18/22  P. v. Bonilla CA4/3
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL BONILLA,<br><br>    Defendant and Appellant. | G057654<br><br>(Super. Ct. No. 15CF0197)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Michael A. Leversen, Judge.  Affirmed as modified.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C.

Ragland, Alana R. Butler, Steve Oetting, and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \*

Daniel Bonilla appeals from his convictions for attempted murder and related crimes and enhancements. The information charged Bonilla, a minor at the time the offenses were committed, with one count each of attempted murder with deliberation and premeditation (Pen. Code, §§ 664, subd. (a), 187, subd. (a); count 1),[1] assault with a firearm (§ 245, subd. (a)(2); count 2), and active participation in a criminal street gang (§ 186.22, subd. (a); count 3). In connection with counts 1 and 2, the information further alleged the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), Bonilla personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)). Lastly, the information alleged Bonilla personally discharged a firearm (§ 12022.53, subd. (c)) and personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)) in the commission of count 1.

The jury found Bonilla guilty of attempted murder and found the firearm and the great bodily injury enhancements true, but found the attempted murder was not deliberate and premeditated. It also convicted Bonilla of assault with a firearm, found true the firearm enhancements alleged in connection with that count, and found Bonilla guilty of actively participating in a criminal street gang.

The court sentenced Bonilla to the middle term of seven years on the attempted murder (count 1) and imposed a consecutive term of 25 years to life on the section 12022.53, subdivision (d) enhancement. Punishment on the remaining enhancements related to count 1 was either stayed or stricken. The court imposed a

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

three-year concurrent sentence on count 2 (assault with a firearm) and stayed the sentence pursuant to section 654. The sentences on the enhancements tied to count 2 were also stayed. Finally, the court imposed a three-year concurrent sentence on count 3 (active participation in a criminal street gang).

Bonilla makes the following claims of error: 1) he was denied effective assistance of counsel when his attorney did not object to the introduction into evidence of the codefendants' plea agreements; 2) the trial court committed prejudicial error in instructing the jury; 3) the trial court erred in failing to stay the sentence imposed on count 3 pursuant to section 654; and 4) the abstract of judgment must be amended to reflect the section 654 stay imposed on count 2. The Attorney General concedes the merit of the last two contentions.

We initially issued an opinion in this matter in October 2020, which Bonilla appealed and on which the Supreme Court granted review pending its decision in another case on a jury instruction issue. The court decided that issue in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*), transferred the cause back to this court, and the parties submitted additional briefing on the instructional issue.

As before, we conclude the ineffective assistance of counsel claim should be litigated in a separate habeas corpus proceeding, not as part of this appeal. We also find no prejudicial error in the trial court's use of the then-standard jury instruction concerning eyewitness identification (CALCRIM No. 315), but accept the Attorney General's concession of error regarding the section 654 claims. Thus, we modify the judgment to reflect the changes required by section 654 and affirm the judgment as modified.

**FACTUAL AND PROCEDURAL BACKGROUND**

On January 15, 2015, J.G., her boyfriend L.C., and her four children were in her white Honda on their way to the park. J.G. was driving. The Honda was in the

3

middle of the driveway of a mobile home park, about to turn onto First Street, when J.G. saw a man later identified as A.C. running from the east toward her car. She stopped the car. A.C. tried to get into the backseat of the Honda. J.G. then saw a silver Lexus driving from the east. It made a U-turn in front of the mobile home park, and a person she later identified as Bonilla got out. Although J.G. did not remember which door he exited, Bonilla was the only person to get out of the car. He had a gun and started shooting at A.C. A.C. ran to the rear of the Honda, attempting to hide.

Bonilla pursued A.C. When Bonilla was in front of J.G.'s car, she heard loud popping noises and directed her children to "duck down." After firing four or five shots, Bonilla ran back to the Lexus. It drove off to the east. J.G. pulled onto First Street and drove in the opposite direction because she did not know if Bonilla was going to return. She then turned around and went back to the mobile home park to call the police. Once she returned, J.G. saw blood on her car where A.C. had leaned against it.

One of the responding police officers eventually took her to a restaurant parking lot where she observed several young males in handcuffs. J.G. saw the Lexus parked in the restaurant lot. She looked at each of the young males, but only recognized Bonilla, the shooter. The officer who took J.G. to the show up said she made her identification of Bonilla from 20 feet away. After the officer took J.G. home, the officer had L.C. accompany him to see if L.C. could identify anyone the police detained.

In describing the shooting, L.C. said he heard a shot and saw A.C. run into the driveway where he, J.G., and the four children were in J.G.'s car. It was clear to him A.C. was running away from something. A car then drove into view. The vehicle appeared to be following A.C. A male got out of the car via the left rear door and gave chase. After unsuccessfully attempting to hide in some bushes, A.C. went to the driver's side of their car and attempted to get in. Bonilla was 10 feet in front of the Honda when he fired at A.C., who was attempting to get into the car. L.C. said Bonilla fired at least three shots at A.C.with a revolver.

4

According to L.C., he made eye contact with Bonilla when he (L.C.) put his hands up and motioned to Bonilla that there were children in the car. J.G. and the children in the back seat were screaming. A.C. was calling out, "Help me, help me." L.C. yelled at him that there were children in the car. L.C. could see blood on the back of A.C.'s shirt. Bonilla ran back to the car stopped in the middle of the street, got in and the car then sped away. A.C. ran toward the office at the mobile home park.

After the police responded, an officer took J.G. away in a patrol car and L.C. stayed with the children. When J.G. returned, an officer took L.C. to a location where he was shown five young male Hispanics who looked like they were in their teens. He was shown the males one at a time. He only recognized Bonilla as the shooter. L.C. was confident in his subsequent in-court identification of Bonilla. He testified he never forgets a face.

When he spoke to the police, L.C. gave his first name, but used his stepbrother's last name. He explained he did so because he is an undocumented alien and there was an outstanding warrant for his arrest.

J.F. testified for the prosecution after entering into a plea agreement. Although he had been charged with possession of methamphetamine for sale (Health & Saf. Code, § 11378), in addition to the attempted murder, assault with a firearm, and active gang participation, along with Bonilla, J.F. pled guilty to being an accessory after the fact (§ 32) and actively participating in a criminal street gang. In exchange for his testimony in this and another matter, J.F. testified he believed he would be sentenced to credit for time served.

According to J.F., he had been washing clothes in the community laundromat at the mobile home park with his two brothers, B.F. and G.F., when there was an altercation with A.C., someone he did not know. A.C. approached B.F. and said, "F**k Middleside." B.F. replied that he was not from Middleside. After another profane comment, A.C. left the laundromat.

5

J.F. stated Middleside is a gang, and the mobile home park is in or near territory claimed by the gang. J.F.'s brothers know people in the gang.

J.F. and his brothers were hungry and decided to get something to eat, so they called Bonilla and V.S. The brothers picked up V.S. and Bonilla, but J.F. then wanted to put more quarters in at the laundromat before they went to eat, so he headed back to the mobile home park. When they got back to the mobile home park, J.F. saw A.C. who was in the driveway holding a "pretty long" stick or pipe. A.C. ran toward J.F.'s car as J.F. was about to pull out into the street, and hit the left rear side of the car with the long stick. J.F. pulled into the middle turn lane and stopped because he wanted to find out who A.C. was. J.F. said he wanted to ask A.C. what his problem was.

J.F. then heard his right rear door open. Bonilla got out of the car. A.C. was still standing at the entrance to the mobile home park. J.F. heard B.F. say, "No," and saw Bonilla running across the street. A.C. ran too. J.F. heard four gunshots.

There was a car in the driveway. It was between Bonilla and A.C. After J.F. made a U-turn, Bonilla returned to the car, got in, and said, "I got him, I got him." J.F. then drove away. While they were driving on Sullivan Street, a police car made a U-turn. It followed them to a shopping center parking lot and eventually the police arrested J.F. and his companions. Officers then brought other people to the location. J.F. remembered sitting in a police car, handcuffed, being taken out of the police car, and told to stand in front of another car.

J.F. believes Bonilla associated with the Middleside gang, based on clothing Bonilla wore in the gang's colors, gray and black, and his having made derogatory comments about other gangs. When J.F. was interrogated by police, he initially denied any knowledge of the shooting. After about 20 minutes, however, he "came clean" and told the police Bonilla was the shooter. He said after a male hit his car, he stopped in the middle of the road; Bonilla then got out of the car, walked up to the male and shot him.

6

When officers responded to the mobile home park, they found blood splatters on the front end of J.G.'s car and drops of blood on the ground. Police also located a wooden stick with a screw sticking out of one of the ends.

Gallardo described Bonilla as 5 feet 8 inches tall, 130 pounds, with brown hair and eyes. Evidence showed B.F., J.F.'s brother, was also 5 feet 8 inches tall, weighed 145 pounds, and had dark hair and brown eyes.

Police searched J.F.'s car and found a number of items. Inside a sock in the rear of the vehicle was a .38-caliber revolver. Inside a passenger door pocket, police found a small black plastic bag containing four expended .38-caliber shell casings. A speed loader and six empty .38-caliber shell casings were found in the glove box. A .38-caliber shell was found inside the center console. DNA samples obtained from the revolver contained DNA material from multiple contributors and could not be pinpointed to any one person. No gunshot residue tests were performed on any of the five suspects.

The police located A.C. at a hospital. He had wounds to his right elbow, right side of his torso, upper thigh, and pelvic region.

Santa Ana Detective Greg Beaumarchais testified as a gang expert. He said Middleside has been an active gang since the 1970's and in January 2015, it had 50 documented members. Beaumarchais was aware of at least five members being convicted of gang-related offenses. The gang claims territory, has symbols, hand signs, rivals, allies, and its primary activities include possession of firearms by prohibited persons. Beaumarchais reviewed the change of plea forms of B.F., G.F., and V.S. He found it significant that B.F. and G.F. each admitted to being Middleside gang members in their respective guilty plea forms. He opined B.F. and G.F. are both active members of the gang. He further opined Middleside is a criminal street gang.

Beaumarchais conducted a background check on Bonilla. He also reviewed prior police contacts, including police reports, and a STEP notice. Beaumarchais found Bonilla's Facebook page and noticed that it included a photograph of Bonilla making an

7

"M" sign with his hand.  It also contained a post concerning a well-respected Middleside gang member who had been killed.  The post referred to Bonilla by his gang moniker, rather than by name.  Beaumarchais also considered Bonilla's tattoos.   On his right wrist and right shin are initials related to Middleside: "MS."

In Beaumarchais's opinion, Bonilla was an active participant in Middleside on the date of the shooting.  In response to a hypothetical question based on evidence from the trial, Beaumarchais stated the shooter's action was committed for the benefit of the Middleside gang.  He said that if an individual "hit up" a Middleside gang member and hit the car with a stick in which Middleside gang members were riding, a Middleside gang member shooting the individual in retaliation for the disrespect would be a "proper violent response."

Lastly, Beaumarchais testified that if a gang member possesses a firearm, the firearm belongs to the gang.  Thus, it can be passed around "very quickly," and there would be DNA from multiple members on the gun.

The plea agreements of B.F., G.F., and V.S., were admitted into evidence. All three pleaded guilty to attempted murder and actively participating in a criminal street gang.  The factual basis for the guilty pleas were similar but not identical.  Each admitted aiding and abetting the attempted murder of "John Doe" by fellow gang members with the specific intent to kill him.  Each admitted the attempted murder was for the benefit of the Middleside criminal street gang and that Bonilla was an active participant in the Middleside gang.  This evidence was admitted without objection.

The defense introduced J.F.'s and L.C.'s statements to police.  Detective Elias Martinez of the Santa Ana Police Department testified he interviewed L.C. at the mobile home park after the shooting; L.C. said he was in the car with J.G. when he saw four juveniles walking outside the mobile home park.  As their car approached the exit, L.C. saw a gray car "kind of" parked in the center lane of the street.  He saw a male come from the area of the parked gray car and then heard three shots.  J.G., L.C., and the

children in their car all put their heads down. A few seconds later, L.C. saw A.C. running toward their car and attempt to get in. He also saw the male who came from the area of the gray car point a gun in their direction. L.C. told J.G. to drive away and she did.

Martinez said L.C. did not tell him that he had made eye contact with the shooter or that he signaled to the shooter the presence of the children in the car. Neither did he say A.C. asked them to help him during the incident.

The defense also introduced J.F.'s statement to the police. J.F. initially denied knowing about the shooting or the ammunition found in his car. Later, he said Bonilla had been sitting behind G.F., who was seated in the right front passenger seat. He said he has known Bonilla for a year or two "because of [B.F.] and [G.F.]." Bonilla and J.F.'s brothers "all hang out."

J.F. denied knowing A.C. was going to be shot. He said Bonilla jumped out of the car and chased A.C., who had run at J.F.'s car and hit it with something "like a crowbar." After the shooting, Bonilla returned to the car and told J.F., "Drive, drive, drive."

## DISCUSSION

1.    *Ineffective Assistance of Counsel*

Bonilla first argues his convictions must be reversed because his counsel provided deficient legal representation. Without objection, the prosecution introduced into evidence the guilty pleas of three of the four other defendants who were in J.F.'s car at the time of the shooting but, unlike J.F., did not testify at the trial. According to Bonilla, his counsel's failure to object to the hearsay statements of B.F., G.F., and V.S. contained in their plea agreements constituted inculpatory evidence which should have been excluded.

A criminal defendant has a federal and state constitutional right to the effective assistance of counsel. (U.S. Const., 6th & 14 Amends.; Cal. Const., art. I,

9

§ 15.)  "To establish ineffective assistance of counsel, [appellant] must demonstrate that (1) counsel's representation was deficient in falling below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation subjected the petitioner to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the petitioner."  (*In re Wilson* (1992) 3 Cal.4th 945, 950, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687.)

An appellant bears the burden on appeal to establish ineffective assistance of counsel.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 218.)  An ineffective assistance claim based on failure to object to inadmissible evidence presents an additional consideration:  "Whether to object to inadmissible evidence is a tactical decision."  (*People v. Hayes* (1990) 52 Cal.3d 577, 621.)

"'[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation].  'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.'"  (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926.)  Consequently, ""'[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.'  [Citations.]  A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding."  (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

"[C]ompetent counsel may often choose to forgo even a valid objection.  '[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings.  The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.'"  (*People v. Riel*

(2000) 22 Cal.4th 1153, 1197.) However, if there could have been no valid reason for failing to object, an appellate court may entertain and determine the merits of an appellant's ineffective assistance of counsel claim without providing counsel an opportunity to state whether the decision was tactical. (*People v. Nation* (1980) 26 Cal.3d 169, 179.)

The appellate record herein does not reveal defense counsel's thought process in deciding not to object to the guilty pleas of the three former codefendants who did not testify, and we cannot say as a matter of law that no competent attorney would have failed to object to that evidence. We can imagine a scenario in which competent counsel would rather have the guilty pleas entered into evidence than have the prosecutor present the live testimony of the former codefendants. Additionally, the guilty pleas established the admitted presence of three other individuals the jury would have to eliminate as the shooter, potentially bolstering defense counsel's argument on Bonilla's behalf that he was not the shooter. In any event, as we do not know whether defense counsel's decision was the result of a reasonable tactical decision or not, we cannot determine whether counsel's failure to object rendered his performance deficient. Thus, any claim of ineffective assistance of counsel in this matter is more appropriately litigated in a separate habeas corpus proceeding, not in this appeal.

2.    *Jury Instruction Issue*

The jury was instructed on the issue of eyewitness identification pursuant to CALCRIM No. 315. That instruction sets forth a number of factors for jurors to consider in determining whether to give credence to an eyewitness identification, including: "How certain was the witness when he or she made an identification?" Bonilla contends this language "resulted in a fundamentally unfair trial" because witness certainty does not necessarily correlate with an accurate identification having been made, and therefore his conviction must be reversed.

11

The Attorney General asserts Bonilla forfeited this issue by failing to object to the instruction or request a modification. (See *People v. Sánchez* (2016) 63 Cal.4th 411, 461 (*Sánchez*) [forfeiture found where the defendant failed to request a modification or object to the certainty factor in CALJIC No. 2.92, the precursor to CALCRIM No. 315].) Anticipating that argument, Bonilla claims his counsel was ineffective for failing to preserve the issue. We need not address these forfeiture and ineffective assistance claims because Bonilla's instructional argument fails on the merits.

At the time of trial, instructing the jury to consider a witness's stated or implied certainty in making an identification was proper. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1232; see *Sánchez, supra*, 63 Cal.4th at p. 462.) The Supreme Court recently revisited the issue in *Lemcke, supra*, 11 Cal.5th 644. The court rejected the defendant's federal and state due process challenges, explaining that "[w]hen considered in the context of the trial record as a whole, listing the witness's level of certainty as one of 15 factors the jury should consider when evaluating identification testimony did not render [the defendant's] trial fundamentally unfair." (*Id.* at pp. 646-647.)

The Supreme Court found the certainty instruction did not lower the prosecution's burden of proof. The court observed that "the instruction does not direct the jury that 'certainty equals accuracy.' [Citation.] Nor does the instruction state that the jury must presume an identification is accurate if the eyewitness has expressed certainty. [Citation.] Instead, the instruction merely lists the witness's level of certainty at the time of identification as one of 15 different factors that the jury should consider when evaluating the credibility and accuracy of eyewitness testimony. The instruction leaves the jury to decide whether the witness expressed a credible claim of certainty and what weight, if any, should be placed on that certainty in relation to the numerous other factors listed in CALCRIM No. 315." (*Lemcke, supra*, 11 Cal.5th at p. 657.) The court noted defendant was permitted to present expert testimony to combat any inference that certainty correlates with accuracy, and the trial court instructed the jury it must consider

12

the expert's opinion (CALCRIM No. 332). (*Lemcke,* at pp. 657-658.) The court stated that other instructions further ensured the prosecutor's burden was not lowered (CALCRIM Nos. 220, 226, 315, & 332). (*Lemcke,* at p. 658.) These instructions were similarly given here.

The *Lemcke* court also rejected the argument that the certainty component of CALCRIM No. 315 deprived the defendant of a meaningful opportunity to present a complete defense. (*Lemcke*, *supra*, 11 Cal.5th at pp. 660-661.) Nothing prevented the defendant from putting on a vigorous defense on the issue of identity, and indeed, as here, the defendant did so. (*Id.* at p. 660.)

Nevertheless, although the court in *Lemcke* affirmed the defendant's conviction, it acknowledged that CALCRIM No. 315 "has the potential to mislead jurors" given "the empirical research that '"under most circumstances, witness confidence or certainty is not a good indicator of identification accuracy."'" (*Lemcke*, *supra*, 11 Cal.5th at p. 665.) "That raises particular concerns in a case like this one, where the conviction was based almost entirely on the testimony of a single witness who expressed certainty in her identification and had no prior relationship with the defendant." (*Id.* at p. 666.) The court requested that the Judicial Council and its Advisory Committee on Criminal Jury Instructions evaluate whether or how the instruction might be modified and directed that, in the meantime, trial courts should omit the certainty factor from CALCRIM No. 315 unless requested by a defendant. (*Lemcke,* at pp. 647-648, 668-669.)

Here, Bonilla argues that, while, as in *Lemcke*, "the jury was told that the prosecution retained the burden to prove [he] was the perpetrator and that witnesses can sometimes make honest mistakes," the absence of defense expert testimony to undermine the certainty factor distinguishes *Lemcke* and requires reversal. The honest mistake instruction referenced by Bonilla, CALCRIM No. 226, told the jury: "People

13

sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently."

Bonilla argues that the prosecutor's closing argument, which emphasized that "we have two people who identified the defendant as the shooter completely independently of each other and of [J.F.]," highlights the prejudice of the certainty language in CALCRIM No. 315 because "nothing disabused the jury of the common misconception that certainty equals accuracy." While J.G. and J.F. did not provide any degree of certainty as to their respective identifications, Bonilla notes that L.C. testified he was confident in his in-court identification more than three years after identifying Bonilla as the shooter because he claimed, "I never forget a face. To this day, anybody. I'll recognize people I don't know after years." Bonilla also emphasizes the prosecutor's argument that J.G. was "never confused about the fact that it was the defendant standing in front of her car shooting the victim" and "did not hesitate" in identifying him again in court as the shooter.

In the absence of expert testimony, and even assuming that it would have been better if the "certainty" language in CALCRIM No. 315 had been omitted, the issue on appeal remains whether it is "reasonably probable defendant would have obtained a more favorable result had the trial court deleted the certainty factor." (*Sánchez*, *supra*, 63 Cal.4th at p. 463.) Bonilla emphasizes that the jury sent the trial court an initial note "after deliberating for 7.4 hours," according to Bonilla's calculation, "indicat[ing] that it was 'hung on who the shooter was'" and then deliberated another 9.5 hours for a total of "16.9 hours" before reaching its guilty verdict. Bonilla cites precedent that "jury deliberations of almost six hours" indicate that the issue of guilt is not "'open and shut.'" (*People v. Cardenas* (1982) 31 Cal.3d 897, 907.) Bonilla emphasizes, as he did at trial, his theory that he was "falsely accused of being the shooter by his co-defendant [J.F.] who was trying to cover for his brother, [B.F.], who was, in fact, the actual shooter."

14

The flaw in Bonilla's bid for reversal is that the jury considered and rejected his theory of an alternate shooter and his attacks on the credibility of the three eyewitness identifications. We presume jurors read and apply the instructions as a whole, as instructed. (CALCRIM No. 200.) This includes express directives in CALCRIM No. 315 to consider whether the witness was "under stress when he or she made the observation," how "closely was the witness paying attention," and the "duration of observation." It also includes factors highlighted in CALCRIM No. 226: "How well could the witness see, hear, or otherwise perceive the things about which the witness testified," "How well was the witness able to remember and describe what happened," and "Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?" The instructions directed the jury to evaluate all of these factors against a backdrop of additional directives: "You alone must judge the credibility and believability of the witnesses," "You may believe all, part, or none of any witness's testimony," that Bonilla "is presumed to be innocent," and that, "[u]nless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." (E.g., CALCRIM Nos. 220, 226, 315.)

Defense counsel vigorously cross-examined the eyewitnesses and noted discrepancies and inconsistencies in what they reported to law enforcement—including that L.C. did not state then that he had seen the shooter's face, admissions some may have ducked down in the split seconds leading up to the shooting, whether J.G. and L.C. had discussed the matter with each other after the shooting and before their testimony, the gang affiliation of J.F.'s brother and J.F.'s motive to protect his brother, and a host of other factors. These other factors included evidence introduced to show Bonilla's alleged resemblance to J.F.'s brother and where they were seated in the car and in relation to where the gun was found (under the driver's seat, accessible by both B.F. and Bonilla in the rear seat).

15

In the end, we cannot ignore that three positive identifications in the immediate aftermath of the shooting distinguish this case from *Lemcke*'s "particular" concern regarding the certainty instruction when "the conviction [i]s based almost entirely on the testimony of a single witness . . . ." (*Lemcke*, *supra*, 11 Cal.5th at p. 666.)  Multiple identifications mitigate that concern because each lends credibility to the other, regardless of certainty expressed (or not) by any one witness.

No witness here gave a subjective—and therefore potentially misleading—assessment of certainty in his or her initial identification.  Instead, the question of certainty regarding the identity of the shooter was left for the jury to evaluate as it applied the reasonable doubt standard.  In light of the proper instructions on the panoply of factors the jury had to consider in deciding the identification issue—including the possibility of another shooter—and in light of the three overlapping and reinforcing eyewitness identifications of Bonilla as the shooter, we do not believe a different result is reasonably probable had the certainty clause been excised from CALCRIM No. 315.

3.    *Cumulative Error*

Bonilla next argues the cumulative effect of his trial attorney failing to object to the admission of the guilty pleas of his former codefendants and the error in instructing the jury pursuant to CALCRIM No. 315 resulted in prejudice that requires reversal.  "'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  However, because we do not decide the ineffective assistance of counsel claim in connection with the admission into evidence of the codefendants' guilty pleas and we find no reversible error occurred in instructing the jury, there is no error to cumulate.  (*People v. Reed* (2018) 4 Cal.5th 989, 1018.)

4.    *Section 654 Error on Count 3*

Bonilla argues the trial court erred in failing to stay pursuant to section 654 the two-year concurrent sentence it imposed on count 3, the conviction for actively

16

participating in a criminal street gang. (§ 186.22, subd. (a).) The Attorney General concedes the error, and we accept that concession.

Section 654 provides, in pertinent part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (§ 654, subd. (a).) This section does not prohibit multiple convictions, it prohibits multiple punishments based on the same act (*People v. Siko* (1988) 45 Cal.3d 820, 823).

Imposition of a concurrent sentence, such as was imposed below, is multiple punishment for purposes of section 654. (*People v. Deloza* (1998) 18 Cal.4th 585, 592.) To avoid multiple punishment when section 654 applies, the court should impose sentence on the count carrying the longest potential sentence (here the attempted murder charge), and then impose and stay execution of the sentence on the count to which section 654 applies, pending successful completion of the sentence imposed and not stayed. (*People v. Sanchez* (2016) 245 Cal.App.4th 1409, 1415.)

The trial court in *People v. Mesa* (2012) 54 Cal.4th 191, 195-196 (*Mesa*), imposed sentences on the defendant for assault with a firearm, possession of a firearm by a felon, and actively participating in a criminal street gang. Each conviction was based on the same act. (*Id*. at pp. 194-195.) Our Supreme Court found the trial court erred in failing to stay the sentence imposed on the conviction for actively participating in a criminal street gang pursuant to section 654. (*Mesa,* at p. 193.) The pertinent facts in the present case are indistinguishable from those in *Mesa*. In *Mesa*, the defendant was sentenced on an assault with a firearm that also served as the basis for his conviction for actively participating in a criminal street gang, for which the court also sentenced the defendant.

17

Here, Bonilla was convicted of three felonies, including active participation in a criminal street gang. They all arose out of the act of Bonilla chasing and shooting A.C. The trial court imposed an aggregate term of 32 years to life on the attempted murder and attached firearm enhancements and imposed a two-year concurrent term on count 3, the conviction of active participation in a criminal street gang. But the sentence on the attempted murder, like the assault charge in *Mesa*, served as the basis of his conviction for actively participating in a criminal street gang. It follows the trial court erred in failing to stay the sentence imposed on count 3 pursuant to section 654.

We will order the sentence on count 3 to be stayed pursuant to section 654 pending successful completion of the sentence imposed on count 1, and then permanently stayed.

5.      *Amendment of the Abstract of Judgment*

Lastly, after sentencing Bonilla to an aggregate term of 32 years to life on count 1 (attempted murder) with its attendant firearm enhancement, the trial court imposed a concurrent three-year midterm sentence on count 2 (assault with a firearm) and ordered it stayed pursuant to section 654. The abstract of judgment, however, fails to reflect the stay. Because the trial court's oral pronouncement prevails over a contrary abstract of judgment (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186), the abstract must be corrected to bring it in compliance with the court's oral pronouncement. The Attorney General agrees. Therefore, we will order the abstract of judgment corrected to show the sentence on count 2 is stayed pursuant to section 654.

**DISPOSITION**

The sentence on count 3 is ordered stayed pursuant to section 654 pending successful completion of the sentence on count 1, and then permanently stayed. The clerk of the superior court is directed to correct the abstract of judgment to reflect that the sentences on counts 2 and 3 are stayed pursuant to section 654, and then forward a

18

certified copy to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.



                                    GOETHALS, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MARKS, J.*

   *Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.